IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Judge Christine M. Arguello**

Civil Action no. 10-cv-01237-CMA-MJW

QUENTIN J. SCHAMBER,

      Plaintiff,

v.

CITY AND COUNTY OF DENVER, a municipal corporation

      Defendant.

---

## ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

---

      This matter is before the Court on Defendant the City and County of Denver's ("Defendant") Amended Motion for Summary Judgment (Doc. # 71), originally filed on June 30, 2011.[1] (Doc. # 55-1.)  Pursuant to his Second Amended Complaint (Doc. # 36), Plaintiff Quentin J. Schamber, an African-American firefighter, alleges that Defendant discriminated against him on the basis of his race, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*, and 42 U.S.C. §§ 1981 and 1983.[2]  Jurisdiction is proper under 28 U.S.C. § 1331.  For the following reasons, Defendant's Motion is granted and this case is dismissed with prejudice.

## I. BACKGROUND

      The following facts are undisputed, unless otherwise noted.  The Court will elaborate, as needed, in its analysis section.

---

[1] On September 12, 2011, the Court granted Defendant's "Motion for Leave to File an Amended Motion for Summary Judgment" (Doc. # 55), and accepted the motion for summary judgment as filed.  (Doc. # 69.)

[2] Defendant is the employer of Plaintiff within the meaning of 42 U.S.C. § 2000e(b).

At all relevant times, Plaintiff was an Engineer with the Denver Fire Department ("DFD") at Station 25 and Lieutenant Dennis Horton was Plaintiff's immediate supervisor. On October 27, 2008, Horton told Plaintiff to stand in front of a fire engine approximately five to ten feet away. Horton then activated the engine's siren without warning Plaintiff.[3] (Doc. # 71 at ¶¶ 2-3.) As a result, Plaintiff suffered a loss of hearing in his left ear and tinnitus (*i.e.*, ringing in the ears).[4] (Doc. # 66 at ¶ 4.) In a post-Incident statement, Horton stated that he had become frustrated with Plaintiff for his "excessive use of the siren on Engine 25," and that he turned on the siren in a misguided attempt to have Plaintiff "understand the use of the sirens." (Doc. # 71-3 at 2-3.) Horton did not turn on the siren for the purpose of intentionally injuring Plaintiff. (Doc. # 71 at ¶ 3.)

Shortly after the Incident, Assistant Chief David McGrail met with Plaintiff and Horton. Plaintiff told McGrail that Horton had activated the siren in front of him without warning, and that he had a headache and ringing in his ears. (Doc. # 71 at ¶ 7.) Although Plaintiff initially indicated that he just wanted to go home, McGrail convinced Plaintiff to go to the medical clinic. (Doc. # 71 at ¶ 9.)

Plaintiff was released to full duty the next day and returned to Station 25 to finish his shift.[5] However, Plaintiff was still experiencing ringing his ears and returned to the medical clinic the next day to have his ears checked more thoroughly by a doctor. The doctor put Plaintiff on modified duty. (Doc. # 71 at ¶ 14.)

---

[3] The Court will hereinafter refer to this event as "the Incident."
[4] Plaintiff has received medical treatment and workers' compensation benefits for his injury. (Doc. # 71 at ¶ 4.)
[5] DFD firefighters work 24-hour shifts every three days. (Doc. # 71-7 at ¶ 17.)

On October 30, 2008, McGrail discussed the Incident with Division Chief of Operations Charles "Randy" Stewart and Deputy Chief Rex King. They agreed that McGrail should conduct an investigation by obtaining written statements from Plaintiff and Horton. (*Id.* at ¶ 16.) The statements were factually consistent in all material respects, and were given to Stewart and King.[6] King then informed DFD Chief Nick Nuanes about the Incident. Stewart, King, and Nuanes all considered Horton's actions to warrant investigation and disciplinary action. (Doc. ## 71-12, 71-13, 71-14.)

On November 14, 2008, Plaintiff approached King and inquired about the status of the investigation. As a result of their conversation, King requested Plaintiff to send him a summarizing letter so that he could assume authority over the investigation. In his letter, Plaintiff stated that he did not want to work with Horton and that he did not "feel safe working with [Horton]." (Doc. # 71-17.)

Plaintiff was released from modified duty on December 22, 2008. (Doc. # 71 at ¶ 29.) If he had immediately returned to Station 25, Plaintiff would have needed to work under Horton. (*Id.*) To avoid this conflict, it was agreed that Plaintiff should take his remaining vacation over three days and be given an additional day of paid administrative leave to end out the year. (Doc. # 71-6 at ¶ 10.) On January 2, 2009, Plaintiff returned to Station 25 on the B shift, and Horton was transferred to the C shift.[7] (Doc # 71 at ¶ 34.) Captain David Spialek, the captain for station 25, attested that he

---

[6] Plaintiff points out several minor discrepancies in the statements, such as Plaintiff's assertion that he was approximately 5-10 feet in front of the engine, whereas Horton stated that Plaintiff stood approximately 10-15 feet away. (Doc. ## 71-2, 71-3.) However, there was no dispute that Horton had turned on the siren near Plaintiff in order to teach him a lesson.

[7] The parties disagree whether the shift resulted from Plaintiff's complaints or was mandatory.

made certain that Plaintiff was always relieved from his duty before Horton reported for duty. (Doc. # 71-6.)  After the January 2, 2009 shift changes, Plaintiff never interacted with Horton again. (Doc. # 71 at ¶ 35.)  Plaintiff did not inform King that he felt unsafe working at Station 25 after January 2, 2009, or that he desired that Horton be transferred to another station. (*Id*. at ¶ 36.)  King believed the conflict had been resolved. (Doc. # 71-13.)

Pursuant to City and County of Denver's Charter, DFD discipline is carried out as followed: DFD's Chief (Nuanes) makes a final recommendation to the Manager of Safety ("MOS"), and then the MOS makes a final decision as to the amount of discipline a DFD member receives. (Doc. # 71 at ¶ 38.)  At all relevant times, the MOS was Alvin LaCabe, an African-American. (*Id*. at ¶ 40.)  On December 8, 2009, Nuanes recommended that Horton receive a 5-day suspension and up to a $10,000 fine. (*Id*. at ¶ 41.)  The MOS rejected this recommendation. On January 5, 2009, Nuanes recommended that Horton be demoted from Lieutenant to Firefighter First Grade. The MOS rejected this recommendation as well. (*Id*. at ¶ 42.)

In mid-January 2009, Daniel Diaz, an Investigator with the Internal Affairs Bureau ("IAB") took over the investigation from McGrail. Diaz attested that "[n]ot much investigation needed to be done because the facts of the incident were not disputed." (Doc. # 71-16.)  After Diaz finished his investigation, the MOS ordered that Horton receive five days of suspension for a total of 120 hours without pay, and be required to take a conflict resolution class on his own time and expense. (Doc. # 71 at ¶ 49.)  Horton was eventually transferred to another station in June of 2009. (Doc. # 71-12.)

4

Defendant filed the Amended Motion for Summary Judgment on June 30, 2011, Plaintiff responded on August 31, 2011 and Defendant replied on September 14, 2011. (Doc. ## 71, 66, 72.)

## I. STANDARD OF REVIEW

Summary judgment is appropriate if the moving party demonstrates that there is "no genuine issue as to any material fact" and that it is "entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In applying this standard, the Court views the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party. *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998) (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). A fact is "material" if, under the applicable substantive law, it is "essential to the proper disposition of the claim." *Id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). An issue of fact is "genuine" if "there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way." *Id.* (citing *Anderson*, 477 U.S. at 248).

The moving party bears the initial burden of demonstrating an absence of a genuine issue of material fact and entitlement to judgment as a matter of law. *Id.* at 670-71. In attempting to meet that standard, a movant who does not bear the ultimate burden of persuasion at trial does not need to disprove the other party's claim; rather, the movant need simply point out to the court a lack of evidence for the other party on an essential element of that party's claim. *Id.* at 671 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)).

Once the movant has met this initial burden, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256. The nonmoving party may not simply rest upon its pleadings to satisfy its burden. *Id.* Rather, the nonmoving party must "set forth specific facts that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant." *Adler*, 144 F.3d at 671. "To accomplish this, the facts must be identified by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein." *Id.*

Finally, the Court notes that summary judgment is not a "disfavored procedural shortcut"; rather, it is an important procedure "designed to secure the just, speedy and inexpensive determination of every action." *Celotex*, 477 U.S. at 327 (quoting Fed. R. Civ. P. 1).

## III. ANALYSIS

Plaintiff alleges that his civil rights were violated because Defendant: (1) did not promptly investigate Plaintiff's complaint against Horton for assaulting him; (2) left Plaintiff under the supervision of Horton; (3) required Plaintiff to use his vacation time in order to be away from Horton; (4) did not immediately transfer Horton to another firehouse; and (5) deprived Plaintiff of the benefits and requirements of the DFD's policies regarding harassment and hazing. (*Id.* at ¶¶ 36, 42.) Plaintiff alleges that these actions and inactions constitute intentional discrimination by Defendant on the basis of race.

The elements of Plaintiff's three discrimination claims are identical. *See Carney City & Cnty. of Denver*, 534 F.3d 1269, 1273 (10th Cir. 2008) ("In racial discrimination suits, the elements of a plaintiff's case are the same whether that case is brought under §§ 1981 or 1983 or Title VII."). For Plaintiff to prevail on his claims, he must establish intentional discrimination through either direct or indirect evidence. *Orr v. City of Albuquerque*, 417 F.3d 1144, 1149 (10th Cir. 2005). In this case, there is no direct evidence of discrimination. Thus, the Court applies the *McDonnell Douglas* burden-shifting analysis to Plaintiff's claims. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973); *Orr*, 417 F.3d at 1149 (summarizing the burden-shifting framework). Under the *McDonnell Douglas* analysis, Plaintiff must first establish a *prima facie* case of discrimination by Defendant. *See* 411 U.S. at 802. To establish a *prima facie* case of discrimination, Plaintiff must demonstrate: "(1) membership in a protected class, (2) adverse employment action, and (3) disparate treatment among similarly situated employees." *Carney v. The City and Cnty. of Denver*, 534 F.3d 1269, 1273 (10th Cir. 2008) (quoting *Orr*, 417 F.3d at 1149). Although Plaintiff, an African-American male, is a member of a protected class, Plaintiff has not provided sufficient evidence showing that he suffered an adverse employment action as a result of Defendant's conduct. Thus, Defendant's Motion for Summary Judgment should be granted.[8]

---

[8] In addition to Plaintiff's failure to establish a *prima facie* case of discrimination, Plaintiff's §§ 1981 and 1983 claims also fail because Plaintiff has not presented any evidence that Defendant's actions were taken pursuant to a custom or policy, as alleged in the Second Amended Complaint. *See Carney*, 534 F.3d at 1273 (to bring a § 1981 claim against a municipality, the plaintiff "must demonstrate that the City's officials acted pursuant to a 'custom or policy' of 'discriminatory employment practices.'") (internal quotations and citation omitted);

1.    <u>Adverse Employment Actions</u>

"[C]laims of adverse action *on the basis of race* [are reviewed] on a case-by-case basis, examining the unique factors relevant to the situation at hand." *Piercy v. Maketa*, 480 F.3d 1192, 1203 (10th Cir. 2007) (internal quotation marks omitted). Adverse employment actions include acts that "constitute a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Haynes v. Level 3 Commc'ns, LLC*, 456 F.3d 1215, 1222 (10th Cir. 2006). Additionally, actions that carry "a significant risk of humiliation, damage to reputation, and a concomitant harm to future employment prospects" may rise to the level of an adverse action." *Annett v. Univ. of Kansas*, 371 F.3d 1233, 1239 (10th Cir. 2004). However, mere inconveniences or alterations of job responsibilities do not suffice to establish an adverse action. *See Piercy*, 480 F.3d at 1203. Thus, although "adverse employment actions extend beyond readily quantifiable losses, not everything that makes an employee unhappy is an actionable adverse action." *MacKenzie v. City and Cnty. of Denver*, 414 F.3d 1266, 1279 (10th Cir. 2005) (quoting *Smart v. Ball State Univ.*, 89 F.3d 437, 441 (7th Cir. 1996)).

At the outset, the Court observes that this is an unusual case because the alleged discriminatory acts primarily concern the discipline that Defendant imposed

---

*Simmons v. Uintah Health Care Special Dist.*, 506 F.3d 1281, 1284-85 (10th Cir. 2007) (to bring a § 1983 claim against a municipality, a plaintiff must show that the city's officials acted pursuant to custom or policy, or that the actions were those of a final policymaker).

upon Horton, as opposed to the typical employment discrimination case in which a plaintiff complains that the defendant treated him unfairly.

Plaintiff first contends that Defendant's failure to transfer Horton from Station 25 immediately after the Incident was an adverse employment action because it caused Plaintiff to be deprived of overtime opportunities. (Doc. # 66 at 12.) Although not cited by either party, the Court is aware that the Tenth Circuit has found that a defendant's denial of overtime opportunities may constitute an adverse employment action. *See Orr*, 417 F.3d 1144, 1151 (finding that action preventing the plaintiffs from working additional overtime constituted an adverse employment action); *Reinhardt v. Albuquerque Pub. Schs. Bd. of Educ.*, 595 F.3d 1126, 1133 (10th Cir. 2010) (finding, in the context of a retaliation claim, that denial of overtime opportunities constituted adverse employment action). This case, however, is highly distinguishable from those cases because Plaintiff was not precluded from working overtime shifts by Defendant; rather, Plaintiff simply did not want to take on overtime shifts where he would work under the supervision of Horton. (*See* Doc. # 45-1 at 75:6-13) (Plaintiff testified at his deposition that he was afraid to work with Horton, and would have refused to work overtime on Horton's shift, which occurred immediately following Plaintiff's shift.).

Furthermore, even if the Court found that Defendant had constructively denied overtime opportunities to Plaintiff by not promptly transferring Horton, Defendant points out that Plaintiff has not presented any evidence that there were available overtime opportunities on Horton's shift. (Doc. # 72 at 6.) Moreover, nothing would have prevented Plaintiff from working the A shift, if he wished to earn overtime. Thus,

9

although Defendant's failure to immediately transfer Horton might have limited Plaintiff's opportunities to work overtime on the C shift, no such limitations were present with respect to the A shift. Plaintiff has not presented any evidence showing that he would have otherwise been able to avail himself of such opportunities on either the A or the C shifts. Instead, Plaintiff merely states that he "lost out on overtime." (Doc. # 66 at 12.) This conclusory assertion does not satisfy Plaintiff's burden to "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256.

Plaintiff also contends that Defendant's failure to transfer Horton in a timely fashion was an adverse employment action because he was forced to live in fear of his safety, lost out on the ability to interact with other firefighters, was constantly on guard, and had to leave the firehouse immediately after his shift was over. (Doc. # 66 at 12.) Basically, Plaintiff contends that he was afraid of Horton, that Defendant did not do enough to alleviate that fear, and that his fear had negative consequences. The Court finds that Plaintiff's continued fear of Horton does not make Defendant's failure to promptly transfer Horton to another firehouse an adverse employment action. First, Plaintiff did not suffer "a significant change in employment status" as a result of Horton remaining at Station 25 after the Incident. *See Haynes*, 456 F.3d at 1222. Plaintiff has not alleged that he was demoted, that his compensation was reduced, that his job responsibilities were altered in any way, or that his future employment prospects were harmed. *See id; Annett*, 371 F.3d at 1239.

10

Forcing a person to work under the supervision of a person who had previously assaulted him could constitute an adverse employment action. *See Johnson v. City of Marseilles*, 06 CV 0955, 2008 WL 94803, at *9 (N.D. Ill. Jan. 8, 2008) (holding that plaintiff suffered adverse action in the form of a constructive discharge where employer forced the plaintiff to work alone at night with a supervisor who had allegedly harassed her).  However, in this case, it is undisputed that Defendant took steps to ensure that there was no further interaction between Plaintiff and Horton, either as a supervisor or as a co-employee.  Although Plaintiff may have preferred that Defendant transfer Horton to another station immediately after the Incident, "not everything that makes an employee unhappy is an actionable adverse action." *Mackenzie*, 414 F.3d at 1279.

At most, the Court finds that Plaintiff suffered a mere inconvenience by needing to avoid Horton during the shift change. *See Piercy*, 480 F.3d at 1203 (mere inconveniences do not suffice to show an adverse action).  Thus, even viewing the evidence in the light most favorable to Plaintiff, the Court finds that he is unable to meet his initial burden under *McDonnell Douglas* of establishing a *prima facie* case of retaliation because he did not suffer an adverse employment action as a result of Defendant's conduct.  Therefore, the Court need not address the remaining steps of the *McDonnell Douglas* analysis. *See Espinoza v. Dept. of Corr.*, No. 10-cv-00548, 2011 WL 5024826, at *7 n.7 (D. Colo. Oct. 21, 2011).

## III. CONCLUSION

Based on the evidence in the record, Plaintiff has not shown that there exists a genuine issue for trial because he has not established a prima facie case of

11

discrimination.  Specifically, Plaintiff has not demonstrated that he suffered an

adverse employment action as a result of Defendant's conduct, nor has he shown that

he was treated differently than other similarly situated individuals.

Accordingly, IT IS ORDERED THAT Defendant's Amended Motion for

Summary Judgment (Doc. # 71) is GRANTED.

It is FURTHER ORDERED that this case is DISMISSED WITH PREJUDICE.

The Final Trial Preparation Conference set for January 6, 2012, and the four day Jury

Trial set to commence on January 23, 2012, are VACATED.

It is FURTHER ORDERED that Defendant shall have its costs by the filing of a

Bill of Costs with the Clerk of the Court within ten days of the entry of judgment.

However, each party shall bear its own attorneys' fees.

DATED:  December 23, 2011

BY THE COURT:

CHRISTINE M. ARGUELLO
United States District Judge